IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CALVIN A. MANN, | : |
| Plaintiff, | : |
| v. | : Civ. No. 09-122-GMS |
| MICHAEL J. ASTRUE,[1] | : |
| Commissioner of Social Security, | : |
| Defendant. | : |

**MEMORANDUM**

I.  **INTRODUCTION**

This action arises from the denial of Calvin A. Mann's ("plaintiff") claim for Social Security benefits. On February 24, 2009, plaintiff filed this appeal from a decision of the Commissioner of Social Security (the "Commissioner"), denying Social Security disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. (D.I. 2.) Administrative Law Judge Melvin D. Benitz (the "ALJ") issued a written decision denying plaintiff's claim for disability benefits on January 6, 2007 (the "ALJ's decision"). (D.I. 14 at 15-24.) This court has jurisdiction over the matter pursuant to 42 U.S.C. § 405(g). In his application, plaintiff claimed he became disabled beginning on December 3, 1998,

---

[1] Carolyn W. Colvin became the Commissioner of Social Security (the "Commissioner") on February 13, 2013, after briefing began. Although, under FED. R. CIV. P. 25, Carolyn W. Colvin should be substituted for Michael J. Astrue, pursuant to 42 U.S.C. § 405(g), no further action is necessary to continue this action.

due to nerve damage and problems with his left arm and wrist. (D.I. 14 at 74, 78-82.) Following the Social Security Administration's ("SSA") denial of his claim, both initially and upon reconsideration, plaintiff requested a hearing before the ALJ. (*Id.* at 41, 48, 50.) A hearing before the ALJ occurred on November 14, 2006, where testimony from plaintiff and an impartial vocational expert, Beth Kelley (the "VE") was provided. (*Id.* at 372-408.) On January 6, 2007, the ALJ issued a written decision concluding plaintiff was not disabled and, therefore, was not entitled to DIB or SSI. (*Id.* at 15-24.) On January 15, 2009, the Social Security Appeals Council declined plaintiff's request for review of the ALJ's decision. (*Id.* at 5, 10.) Plaintiff filed a timely appeal with this court on February 24, 2009. (D.I. 2.) Presently before the court are the parties' cross-motions for summary judgment. (D.I. 17, 21.) For the reasons that follow, the court will deny plaintiff's motion for summary judgment and grant defendant's motion for summary judgment.

## II. BACKGROUND

Plaintiff was born on August 27, 1958. (D.I. 14 at 39, 376.) His highest educational degree is a high school diploma. (*Id.* at 376.) His alleged disability dates to December 3, 1998. (*Id.*) Plaintiff contends the ALJ improperly failed to consider whether he met the requirements for an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1, and the ALJ's hypothetical question to the VE was deficient. (D.I. 18 at 22-26.)

### A. Medical Evidence

On December 3, 1998, plaintiff suffered a comminuted displaced fracture of the

left distal radius as a result of a ten foot fall to a hardwood floor while working as a drywall hanger and finisher. (D.I. 14 at 109, 376.) On the same day, Dr. James Marvel performed a closed reduction and applied external fixation to properly align the fractured fragments in his wrist. (*Id.* at 109, 113.) Plaintiff was discharged from the hospital the following day after post reduction x-rays revealed satisfactory position of the pin placement and fracture fragments. (*Id.* at 109.)

On December 17, 1998 during a follow-up evaluation, an x-ray showed a probable fracture of the left fifth finger. (*Id.* at 167.) The wrist pin fixation was "in good position." (*Id.*) Plaintiff was prescribed Percocet to manage his pain. (*Id.*) On January 5, 1999, Dr. Marvel noted plaintiff reported pain and hypesthesia, or decreased sensation, in his left hand, however, his wrist fracture was healing despite "some slight radial shortening." (*Id.* at 165.) Plaintiff was again prescribed Percocet. (*Id.*) On January 26, 1999, plaintiff complained of continued pain, discomfort, tenderness, and numbness. (*Id.* at 164.) Dr. Marvel found no significant swelling of the wrist and progressive healing had continued. (*Id.*) Shortly thereafter, plaintiff contacted Dr. Marvel's office reporting he slammed his left hand in the car door, and requested additional pain medication. (*Id.*) Percocet was again prescribed. (*Id.*)

On February 5, 1999, the external fixator was removed. (*Id.* at 163.) On February 16, 1999, Dr. Marvel noted plaintiff's continued lack of feeling in his left fifth finger, no significant swelling and a healing fracture. (*Id.*) The doctor prescribed physical therapy three times per week for four weeks. (*Id.*) Plaintiff started occupational therapy on February 22, 1999, and attended through July 21, 1999. (*Id.* at

149-51.) The occupational therapist observed plaintiff as having a negative attitude, disinterested and unmotivated on multiple occasions. (*Id.* at 119, 121-24.) Plaintiff missed multiple appointments, and was angry and abusive during one appointment. (*Id.* at 119, 121, 125.) Although instructed to bring his drywall tools to therapy, plaintiff refused to do so. (Id. at 119-22.) Ultimately, the occupational therapist reported that plaintiff "would greatly benefit" by returning to work, as he was "capable of performing most drywalling duties" as of the July 20 appointment. (*Id.* at 120.)

During therapy, plaintiff sought a second opinion from Dr. Bruce Topol on March 15, 1999, who noted "degenerative changes of the left hand, greater than expected for age, with demineralization." (*Id.* at 159.) The following day, Dr. Marvel indicated the fracture was well healed, some deviation of the fifth finger, continued numbness, and "evidence of ulnar nerve damage." (*Id.* at 161.) Dr. Marvel suggested plaintiff try returning to work. (*Id.*) Dr. Topol referred plaintiff to a neurologist, and on March 23, 1999, Dr. Robert Varipapa diagnosed plaintiff with severe ulnar neuropathy, which required surgery. (*Id.* at 117.)

On April 16, 1999, plaintiff returned to Dr. Topol for a pre-surgery examination, who noted the orthopedic injuries had "healed very nicely," but numbness, decreased range of motion, and decreased strength in the left hand were evident. (Id. at 154.) On April 19, 1999, Dr. Topol performed a neurolysis of the ulnar nerve in the left distal forearm and proximal wrist. (*Id.* at 156-57.) On August 19, 1999, Dr. Varipapa noted post-surgery improvement of the neuropathy compared with plaintiff's March 23 evaluation. (*Id.* at 115-16.)

On August 26, 1999, plaintiff saw Dr. Errol Ger, an orthopedic hand specialist, for complaints of pain and weakness in the wrist, and a tingling sensation in the little and ring fingers. (*Id.* at 210.) Plaintiff reported to Dr. Ger that he could not hold a pan of mud in his left hand, as required for his job, and was not trained to do any work other than installing drywall. (*Id.*) Dr. Ger noted plaintiff's reduced grip strength of 35 pounds in the left hand, compared with 80 pounds in the right hand; and pinch strength of 8 pounds in the left hand compared with 22 pounds in the right hand. (*Id.* at 211.) X-rays showed a healed wrist fracture with malunion, and an "obvious" shortening of the radius and loss of angulation of the distal radius. (*Id.*) Dr. Ger recommended plaintiff undergo a corrective osteotomy to recreate normal angulation of the distal radius, and concluded plaintiff could not work as a drywall hanger. (*Id.* at 212.)

On September 30, 1999, plaintiff returned to Dr. Marvel, who reported "full range of motion with the exception of a few degree lack of dorsiflexion," and "full supination and [two-thirds] of the arc of pronation." (*Id.* at 160.) Dr. Marvel agreed with Dr. Ger's evaluation, but noted his concern that a corrective osteotomy "may not improve [plaintiff's] functional ability or his motivation for return to work." (*Id.*) Dr. Marvel referred plaintiff to Dr. Peter Townsend, a surgeon, and on October 8, 1999, plaintiff reported to Dr. Townsend that his symptoms were worse than before the neurolysis. (*Id.* at 237.) On November 1, 1999, Dr. Townsend performed a revised ulnar nerve release, scar revision, carpal tunnel release, and a left ulnar shortening osteotomy, which included the placement of an ulnar plate. (*Id.* at 169-82, 236.) His cast was removed on January 7, 2000 with plaintiff reporting "expected stiffness and soreness,"

and no change in his paresthesia. (*Id.* at 233.) At that time, Dr. Townsend noted plaintiff could work full-time, but without use of his left arm or hand. (*Id.* at 333.)

Dr. Townsend referred plaintiff to physical therapy, which began on January 12, 2000. (*Id.* at 187.) His wrist was evaluated as having good restorative potential. (*Id.*) Plaintiff continued physical therapy while incarcerated from March to April 2000. (*Id.* at 207.) In June 2000, plaintiff reported 'very good relief of his wrist pain" to Dr. Townsend, however the paresthesia and weakness continued. (*Id.* at 233.) On June 19, 2000, Dr. Ger examined plaintiff and noted he was "not fit to return to his previous-full time work without restriction" due to the limited strength in his left hand, but was able to work with both hands "within the tolerance of his pain and limited grip strength." (*Id.* at 208-09.) On September 1, 2000, Dr. Townsend agreed with Dr. Ger's assessment of plaintiff's work restrictions. (*Id.* at 332.)

On May 31, 2001, Dr. Ger indicated plaintiff could not return to drywall installation, but was capable of full-time light duty work. (*Id.* at 205.) Dr. Ger also noted that "maximum medical improvement ha[d] been reached." (*Id.*) On August 6, 2001, plaintiff underwent surgery, performed by Dr. Townsend, to remove the ulnar plate due to complaints of pain and discomfort. (*Id.* at 232, 341-44.) On November 30, 2001, plaintiff reiterated complaints of persistent pain in his wrist to Dr. Townsend, who permanently restricted him from lifting more than ten pounds with his left hand, or climbing to an unprotected height. (*Id.* at 225, 227.)

On February 18, 2002, a state agency medical consultant reviewed plaintiff's medical record in conjunction with his December 2001 application for DIB. (Id. at 189-

96.) The consultant determined plaintiff had a residual functional capacity ("RFC") sufficient for performing medium work, with limitations on carrying more than ten pounds with his left hand and exposure to machinery, vibration, and temperature extremes. (*Id.*) On May 21, 2002, Dr. Ger examined plaintiff, who complained the pain was present "about [ninety percent] of the time," with a shock-like sensation occurring "about [eighty percent] of the time." (*Id.* at 202.) Dr. Ger stated that "[he] would not advise any further medical or surgical treatment." (*Id.* at 203.)

On January 10, 2003, Dr. Jay Fried of the Delaware Disability Determination Service ("DDS") performed a physical examination and concluded plaintiff had no functional use of his left hand, and would benefit from more pain medication and additional job skills to help him adapt to working primarily with his right hand. (*Id.* at 214-15.)[2] On January 16, 2003, Dr. Vinod Kataria performed another residual functional capacity ("RFC") assessment and determined plaintiff could perform light work, with limited pushing, pulling, handling, and exposure to vibration and machinery. (*Id.* at 216-23.)

Plaintiff returned to Dr. Townsend on March 14, 2003, complaining about the virtual uselessness of his hand and frequent pain radiating up his arm. (*Id.* at 224.) Dr. Townsend determined plaintiff's "reported pain and limitation of function [was] of

---

[2]DDS is a state administered federal program that serves Delawareans who are unable to work because of a disability. Although it is a state agency, it is governed by the Social Security Administration and 100% federally funded. DDS develops, adjudicates, and processes disability claims for Social Security disability benefits and considers whether a person meets the statutory definition of a disability under the Social Security Act and whether the disabled individual meets medical eligibility to receive Social Security Disability Insurance or Supplemental Security Income. *See generally* www.delawareworks.com/dvr/services/dds.shtml.

unknown etiology" and his "[s]ubjective complaints [were] now out of proportion to [the] objective findings." (*Id.*) Plaintiff then began seeing Dr. Sami Moufawad in April 2003 for pain management relating to his wrist, arm, and neck. (*Id.* at 243-46.) Dr. Moufawad diagnosed cervical radiculitis and left ulnar neuropathy, and prescribed several pain medications, which plaintiff failed to take regularly despite the relief they provided. (*Id.* at 249-50.)

On August 17, 2003, Dr. Anne Aldridge performed a third RFC assessment regarding plaintiff's 2002 claim for DIB, and reached the same conclusion as Dr. Kataria: plaintiff was capable of engaging in light work, with limited pushing, pulling, handling, and exposure to vibration and machinery. (*Id.* at 259-66.) In December 2003, plaintiff complained of continuous burning and pain in his left wrist, and pain radiating from his neck and down his arm. (*Id.* at 247.) Dr. Moufawad recommended a regular exercise program and offered a trial of epidural steroid injections, which plaintiff declined. (*Id.*) Plaintiff was diagnosed with osteoporosis in March 2004. (*Id.* at 271.)

Dr. Aldridge again reviewed plaintiff's medical records in April 2004 in connection with his claim for DIB and SSI. She concluded he was capable of a limited range of light work, mostly sedentary, with limited exposure to cold, wetness, or vibration, no frequent lifting over five pounds, and only occasional lifting of ten pounds. (*Id.* at 280-87.) Dr. Irwin Lifrak examined plaintiff on October 24, 2004, and suggested degenerative joint disease with possible disc and nerve damage, but reported plaintiff could sit for six to seven hours, stand for six hours, climb stairs, lift up to twenty pounds with his right hand, and occasionally lift ten pounds and frequently lift five pounds with

his left hand. (*Id.* at 291.) Dr. Kateria performed a fifth RFC assessment in which he again concluded that plaintiff was capable of performing light work. (*Id.* at 294-301.) In November 2005, Dr. Vineet Puri ordered an MRI of plaintiff's cervical spine that showed three herniated discs, which were contributing to the pain in his left arm. (*Id.* at 303-04.) Dr. Puri diagnosed cervical disc prolapse and recommended against full-time work for a period of six to twelve months. (*Id.* at 302.)

### B. Hearing Testimony

#### 1. Plaintiff's Testimony

At the November 14, 2006 hearing before the ALJ, plaintiff testified about his background, the nature of his DIB and SSI claims, and the course and extent of his medical treatment. (*Id.* at 374-99.) Plaintiff testified he worked as a drywall hanger and finisher for about twenty-five years prior to December 3, 1998, when he fell from a ladder and broke his wrist. (*Id.* at 376-78.) His only employment experience was working with drywall. (*Id.* at 377.) He claimed treating with ten to twelve doctors and undergoing four or five surgeries for his wrist. (*Id.* at 377, 392.) He received workers' compensation benefits from 1998 until 2003, and then settled his claim. (*Id.* at 379, 391.)

Plaintiff stated surgery is needed for the herniated discs in his neck, but because its effectiveness is uncertain and his fear of needles, he has refused the procedure. (*Id.* at 384, 390.) At the time of the hearing, plaintiff was taking approximately thirteen pills per day, primarily pain medications. (*Id.* at 381.) The pain in his hand feels like an electrical shock, followed by numbness. (*Id.* at 385.) He rated his daily average pain

level at a seven or eight out of ten, with the pain reaching level ten in damp weather as often as three times a week. (*Id.* at 385-86.) At times, the pain becomes so severe that he wants the arm amputated. (*Id.* at 385.) His solution is to rest, take more medication, and sleep. (*Id.* at 385-86.) Sleeping is difficult and limited to two to three hours a night. (*Id.* at 386.) He uses his right hand for "basically everything," due to the pain and lack of strength in his left hand. (*Id.* at 388.)

In describing his daily activities, plaintiff testified he usually watches television or tries to sleep. (*Id.* at 386, 393.) He is unable to do housework or drive a car, but does attend Alcoholics Anonymous meetings once a week and church at least three times a month. (*Id.* at 393-94.) The amount of time he can sit or stand in one place varies, depending on the level of pain he is experiencing. (*Id.* at 389-90.)

### 2. The Vocational Expert's Testimony

At the same hearing, the VE offered testimony regarding plaintiff's background, limitations, and the number of jobs in the local and national economy plaintiff could potentially perform. (*Id.* at 396-407.) Specifically, she testified that a hypothetical person, as described by the ALJ, with plaintiff's RFC and lack of transferable skills, could work as a product examiner, sorter, or locker room attendant. (*Id.* at 399-400.) According to the VE, there are approximately 1,000 local and 125,000 national product examiner jobs, 200 local and 60,000 national sorter jobs, and 40 local and 85,000 national attendant jobs available. (*Id.*) About fifty percent of these jobs could be performed in either a sitting or standing position. (*Id.*) The VE did say, however, that severe pain causing a twenty percent reduction in productivity or a ten minute

10

interruption more than once a day (beyond scheduled breaks) would likely present a problem for the employer. (*Id.* at 401-04.)

### C. The ALJ's Findings

The SSA's five-step evaluation requires the following sequential analysis:

> The ALJ first considers whether the claimant is currently engaged in substantial gainful employment. If he is not, then the ALJ considers in the second step whether the claimant has a severe impairment that significantly limits his physical, or mental ability or perform basic work activities. If the claimant suffers a severe impairment, the third inquiry is whether, based on the medical evidence, the claimant's impairment meets the criteria of an impairment found in [20 CFR Part 404, Subpart P, Appendix 1]. If the claimant's impairment or combination of impairments meets or equals an impairment set forth in the listing of impairments, the claimant is disabled. If the impairment does not meet the criteria for a listed impairment, the ALJ must first determine the claimant's [RFC] before moving on to the fourth and fifth steps of the evaluation process. . . At step four, the ALJ assesses whether, despite the existence of the severe impairment, the claimant has the RFC to perform his past work. Assuming he can, he is not disabled. If, however, the ALJ determines that the claimant cannot perform his past work, then, at step five, the ALJ must determine whether there is other work in the national economy that the claimant can perform. If the claimant can perform other work, he is not disabled; if he cannot [ ], he will be found disabled.

*Anderson v. Astrue*, 825 F. Supp. 2d 487, 492 (D. Del. 2011); 20 C.F.R. § 404.1520 (2012).

Based on the factual evidence and testimony of plaintiff and the VE, the ALJ determined plaintiff was not disabled, and therefore, not entitled to DIB or SSI. (*Id.* at 24.) His findings are summarized as follows:

> 1. The claimant met the insured status requirements of the Social Security Act through December 31, 2003.
>
> 2. The claimant has not engaged in substantial gainful activity since December 3, 1998, the alleged onset date (20 CFR §§ 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

11

3. The claimant has the following severe impairment: degenerative disc disease (20 CFR §§ 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR §§ 404.1520(d), 404.1525, 404.1526, 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the [RFC] to perform a significant range of light work. He is limited to work that can be performed with one hand with minimal assistance from the other. He has a limited range of motion of the left shoulder and is limited in pushing, pulling, and grip with the upper left extremity. He must avoid temperature and humidity extremes, heights, and hazardous machinery.

6. The claimant is unable to perform any past relevant work (20 CFR §§ 404.1565 and 416.965).

7. The claimant was born on August 27, 1958, and was 40 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR §§ 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR §§ 404.1564 and 416.064).

9. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR §§ 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR §§ 404.1560(c), 404.1566, 416.960(c), and 416.966).

11. The claimant has not been under a "disability," as defined in the Social Security Act, from December 3, 1998 through the date of this decision (20 CFR §§ 404.1520(g) and 416.920(g)).

(D.I. 14 at 15-24.)

## III. STANDARD OF REVIEW

### A. Motion for Summary Judgment

Summary judgment is appropriate when the reviewing court determines that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *See Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005). In making this determination, the court is required to review the entire record and "draw all reasonable inferences in favor of the nonmoving party, [but] may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

This standard does not change merely because there are cross-motions for summary judgment. *Appelmans v. City of Philadelphia*, 826 F.2d 214, 216 (3d Cir. 1987). Cross-motions for summary judgment:

> are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.

*Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968). "The filing of cross-motions for summary judgment does not require the court to grant summary judgment for either party." *Krupa v. New Castle Cnty.*, 732 F. Supp. 497, 505 (D. Del. 1990).

### B. Review of the ALJ's Findings

The court will uphold the ALJ's factual decisions supported by substantial evidence. 42 U.S.C. § 405(g); *Kinsey v. Astrue*, No. 11-301-RGA, 2012 WL 2879015, at *3 (D. Del. July 13, 2012); *see also Woody v. Sec. of the Dep't of Health & Human*

*Serv.*, 859 F.2d 1156, 1159 (3d Cir. 1988) (applying the substantial evidence standard to motions for summary judgment in a social security case). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 522, 564-65 (1988) (internal citation omitted). This standard requires "less than a preponderance of the evidence but more than a mere scintilla." *Kinsey*, 2012 WL 2879015, at *3; *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). As such, credibility determinations are within the discretion of the ALJ and should be tampered with on review only if they are not supported by substantial evidence. *See Van Horn v. Schweiker*, 717 F.2d 871, 973 (3d Cir. 1983). The court may not "undertake a de novo review" or "re-weigh the evidence of record" in making such determinations; thus, the court accords the ALJ's decision deference as long as it is supported by substantial evidence. *Kinsey*, 2012 WL 2879015, at *3; *see also Monsour Medical Ctr. v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986).

## IV. DISCUSSION

### A. The ALJ's RFC Determination

Plaintiff argues the ALJ erred by failing to consider and analyze his impairments under Listing § 1.07, which refers to:

> Fracture of an upper extremity with nonunion of a fracture of the shaft of the humerus, radius, or ulna, under continuing surgical management, as defined in 1.00M, directed toward restoration of functional use of the extremity, and such function was not restored or expected to be restored within 12 months of onset.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.07 (2012)

The ALJ determined plaintiff's degenerative disc disease, while a severe impairment, does not meet or medically equal any of the listed impairments. (D.I. 14 at 17, 19.) He specifically considered §§ 1.02, 1.04, and 1.08 in concluding that the medical records and hearing testimony are insufficient to support a finding that plaintiff meets the required limitations. (*Id.* at 19.) Plaintiff argues his disability medically equals Listing § 1.07. (D.I. 18 at 25.)

If a claimant's impairment or combination of impairments matches or medically equals all of the criteria in one or more of the listings, the claimant is presumed disabled and no further inquiry is necessary. *Sullivan v. Zebley*, 493 U.S. 521, 531-33 (1990). In determining if a disability medically equals a listed impairment, the claimant must present evidence that his disability is equal in severity to all criteria specified in the most similar listing. *Id.* at 531-32; *see also Manerchia v. Astrue*, No. 09-447-GMS, 2011 WL 6014021, at *11 (D. Del. Dec. 1, 2011) ("[I]t is within the realm of the ALJ's expertise to determine the closest applicable listed impairment."). Evidence showing some of the criteria or showing only an overall functional impact as severe as the listed impairment is insufficient to support an ALJ's finding of equivalence. *Sullivan*, 493 U.S. at 531-32. On review, the court need only ensure these findings are supported by substantial evidence because the "ultimate decision concerning the disability of a claimant is reserved for the [ALJ]." *Knepp v. Apfel*, 204 F.3d 78, 85 (3d Cir. 2000); *see also Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (ALJ is not required to employ any "particular language or adhere to a particular format in conducting his analysis," but must "ensure that there is sufficient development of the record and explanation of

findings to permit meaningful review."). Contrary to plaintiff's contentions, the ALJ supported his analysis with substantial evidence and did not err in failing to specifically mention Listing § 1.07 in his opinion.

The ALJ's decision, when read as a whole, demonstrates he considered all necessary factors in determining that plaintiff's disability did not meet any of the listed impairments. See Jones, 364 F.3d at 505. The ALJ discussed the medical evidence in detail, but ultimately concluded plaintiff's subjective complaints regarding the intensity and limiting effects of his pain were "not entirely credible." (D.I. 14 at 19.) He based this conclusion on a variety of factors: lack of objective medical reports substantiating his subjective pain complaints, an absence of continuous medical treatment other than "conservative routine maintenance," and lack of any indication from the numerous treating or examining physicians that plaintiff's condition meets or equals a listed impairment. (Id. at 19-20.) Most importantly, state agency medical consultants completed five separate RFC assessments, all concluding that plaintiff was capable of performing some level of work. (Id. at 21-22.) The ALJ accorded substantial weight to these assessments because they were consistent with the medical evidence, based upon thorough review of the record, and conducted by physicians familiar with the Social Security Rules and Regulations, its listings, and its legal standards. (Id. at 22); See Reed v. Astrue, 810 F. Supp. 2d 688, 701-02) (D. Del. 2011) ("Because . . . state agency medical consultants are highly qualified physicians and experts in Social Security disability evaluation, their opinions on a claimant's [RFC] are entitled to weight.") (internal quotations omitted); 20 C.F.R. § 404.1527(c), (e). Moreover, the findings of DDS physicians, including their RFCs, were not inconsistent with the

16

conclusions of plaintiff's treating physicians.

The ALJ weighed all relevant medical evidence in reaching his conclusion regarding the applicability of the listed impairments. He was not required to specifically mention Listing § 1.07 in his decision in order to satisfy step three of the sequential analysis. *Compare Jones*, 364 F.3d at 505 (affirming ALJ's findings that no listed impairments applied because the ALJ properly examined and discussed all of the claimant's medical history in reaching that conclusion), *with Manerchia*, 2011 WL 6014021, at *12 (finding error in the ALJ's failure to consider certain listed impairments because he ignored several key MRI and physicians' reports in making his decision). Here, the ALJ has not ignored medical evidence or unreasonably disregarded medical opinions or testimony. Rather, the decision as a whole illustrates that he examined all appropriate factors, including medical reports, RFC assessments, and plaintiff's treatment, and has acted within his discretionary authority in deciding that none of the listed impairments apply. *See Jones*, 364 F.3d at 505. Because his decision is supported by substantial evidence, the court finds that the ALJ did not err in failing to specifically discuss Listing § 1.07.

2.  **VE Hypothetical**

Plaintiff further contends the ALJ erred in failing to specifically include pain as a limitation in the hypothetical to the VE. (D.I. 18 at 25.) The ALJ's question to the VE is as follows:

> [Assume] a person who is 40 years of age on his onset date; has a 12th grade education; the past relevant work as indicated; right-handed by nature; suffering generally and mainly from degenerative disk disease at the cervical level. And he does have moderate pain and discomfort,

> severe on occasion . . . [and] decreased range of motion in that left upper extremity and shoulder. The file indicates he has 5/5 strength, somewhat relieved with his medications. He indicates he has some nausea associated with one or a combination. And what I'm kind of looking for, Ms. Kelley, is jobs that can generally be performed with one hand at the light exertion level with a minimal assist from the other. And like I say, he would be limited as to push and pull or grip in that left upper extremity, overhead reaching. Probably avoid temperature and humidity extremes and heights and hazardous machinery. But with the jobs that can be performed with one hand with assist from the other at the light level, could you give me significant jobs that might exist?

(D.I. 14 at 398-99)

For the VE's testimony concerning a claimant's ability to find alternative employment to be considered for purposes of determining disability, a hypothetical question must "accurately portray[] the claimant's individual physical and mental impairments." *Podedworny v. Harris*, 745 F.2d 210, 218 (3d. Cir. 1984). The question does not need to contain "every impairment *alleged* by a claimant," but it must accurately convey "all of the claimant's *credibly established limitations*." *Rutherford*, 399 F.3d at 554 (emphasis in original). Here, plaintiff's argument fails for two reasons: 1) the ALJ's hypothetical clearly includes reference to moderate and severe pain; and 2) plaintiff's subjective complaints of pain were not substantiated by objective medical evidence.

Plaintiff initially argues that even though the ALJ mentions pain at the beginning of the question, the later absence of pain at the end of the question renders it deficient. (D.I. 18 at 25.) He fails to cite any authority suggesting that every limitation mentioned in the beginning of the hypothetical must be repeated at the end. (*Id.* at 26). The structure and content of the ALJ's hypothetical is in accordance with those generally posed to VEs during this type of hearing. *See, e.g., Reed*, 810 F. Supp. 2d at 697;

18

*Wimbley v. Massanari*, No. 99-616-GMS, 2001 WL 761210, at *4 (D. Del. June 21, 2001); *Bowers v. Astrue*, No. 10-622-RGA, 2012 WL 3150392, at *2 (D. Del. Aug. 2, 2012).

Plaintiff further contends the ALJ erred in failing to quantify the frequency or duration of his pain within the hypothetical question. (D.I. 18 at 27.) The ALJ is required to include any impairments that are credibly established. *Rutherford*, 399 F.3d at 554. Although the ALJ correctly mentioned plaintiff suffers from moderate to severe pain as a result of his impairments, he was not required to specify the frequency or duration of that pain because those details were not credibly established in the medical record. *See Hall v. Astrue*, 10-379-CJB, 2012 WL 292473, at *22 (D. Del. Jan. 18, 2012) (holding that ALJ was not required to characterize claimant's hand pain as "severe" because its severity was not credibly established in the record). The ALJ concluded in his decision that plaintiff's subjective complaints "concerning the intensity, persistence, and limiting effects of [his pain] are not entirely credible" due to the lack of objective medical evidence supporting them. (D.I. 14 at 19.) This finding is consistent with at least one of plaintiff's treating physicians, Dr. Townsend. (*Id.* at 313.) Because specific statements about the intensity, frequency, and duration of pain were not part of the credibly established medical record, the ALJ was not required to elaborate beyond mentioning that plaintiff suffers from "moderate pain and discomfort, severe on occasion." (D.I. 14 at 398.) *See Hall*, 2012 WL 292473, at *22 ("No authority require[s] the ALJ to insert [the claimant's] own characterizations of pain and other symptoms *in haec verba* into the hypothetical question. . . . [T]he Third Circuit has required only that

19

the ALJ accurately convey any impairments that are credibly established by the record.") (internal quotations omitted). By referencing plaintiff's moderate and severe pain in the hypothetical question to the VE, the ALJ did not disregard plaintiff's complaints of pain, and he accurately conveyed the credibly established impairments. As such, his hypothetical question to the VE was sufficient.

With due consideration given to the parties arguments and submissions, and the applicable law, the court finds that the ALJ's disability determination was properly supported by substantial evidence.

## V. CONCLUSION

For the foregoing reasons, the plaintiff's motion for summary judgment is denied, and the defendant's motion for the summary judgment is granted.

SO ORDERED, this ___ day of _____, 20__

_____
UNITED STATES DISTRICT JUDGE